**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| RONALD CHRISTOFORO and MICHELE CHRISTOFORO, | Civil Case No. 3:26-cv-00649 |
| *Plaintiffs,* | |
| v. | |
| UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, | April 27, 2026 |
| *Defendant.* | |

## COMPLAINT

1.      Men and women who served in the U.S. military in Vietnam were exposed to Agent Orange and other toxic herbicides. For years after returning home, Vietnam veterans fought for the government to recognize that this toxic exposure caused many of their disabilities, and eventually secured access to the health care, disability compensation, and other benefits they were due.

2.      When Vietnam veterans began to start families, it became apparent that their children had birth defects at rates higher than the general population. This led to a second struggle by the Vietnam generation of veterans in the 1990s. In response, Congress ordered studies into the impact of Agent Orange exposure on birth defects and subsequently authorized the Secretary of Veterans Affairs to provide benefits to the subset of children of Vietnam veterans born with spina bifida birth defects.

3.      In 2000, Congress went a step further and authorized the Secretary to identify and provide benefits for birth defects of "children of *women* Vietnam veterans" associated with the service of those veterans in Vietnam. 38 U.S.C. § 1812(a). The Secretary has since exercised this

1

authority to recognize eighteen birth defects associated with service in Vietnam and provide benefits to children born with any of those conditions, provided the child's mother served in Vietnam.

4.     Approximately 200 children with birth defects have been born to women Vietnam veterans. By contrast, an estimated 350,000 children with birth defects were born to male Vietnam veterans, given that men served in much higher numbers than women. Except for those with spina bifida, the children of male Vietnam veterans are categorically ineligible for benefits.

5.     At the time Congress adopted this sex-based provision in 2000, scientific research regarding genetic inheritance from fathers was in its infancy. However, research since 2000 demonstrates that paternal exposure to Agent Orange contributes to congenital birth defects at least as readily as maternal exposure. The children of Agent Orange have fathers as well as mothers.

6.     Michele Christoforo is one of these children. Her father, Mr. Ronald Christoforo, voluntarily enlisted in the U.S. Army in 1969. He served as a telecommunications technician and supported special operations in Vietnam. After three years, including one year deployed to Vietnam where he was exposed directly to Agent Orange, Mr. Christoforo completed his service honorably and returned home to Connecticut.

7.     In 1992, his daughter Michele was born with achondroplasia, a rare congenital birth defect that causes dwarfism. There is no known genetic history of the achondroplasia in either Mr. Christoforo's family or that of Mary-Lee Christoforo, Mr. Christoforo's wife and Michele's mother.

8.     Over the years, Mr. Christoforo heard stories from fellow veterans about the lasting effects of Agent Orange: unexplained illnesses, devastating diagnoses, and children born

with severe disabilities. One veteran described the death of both of his children after they played in the fatigues he brought home from Vietnam that still carried traces of Agent Orange.

9.     Mr. Christoforo eventually learned that modern scientific research has linked exposure to dioxin, a toxic and persistent contaminant in Agent Orange, to genetic damage and congenital disorders affecting veterans' children. He discovered that the U.S. Department of Veterans Affairs ("VA") specifically recognizes Michele's condition, achondroplasia, as a birth defect associated with service in Vietnam.

10.     But when Michele applied for benefits, VA denied her claim. VA informed Michele that she would only be eligible if her mother, and not Mr. Christoforo, had served in Vietnam.

11.     The Supreme Court has explained that governmental distinctions based on the sex of one's parent is constitutionally suspect sex discrimination, subject to heightened scrutiny under the equal protection principles of the Fifth Amendment.

12.     Michele and Mr. Christoforo respectfully ask this Court to declare unconstitutional the exclusion of children of male Vietnam veterans with birth defects from eligibility for VA benefits that are available to children with the same conditions born to women Vietnam veterans. Today, this statutory sex discrimination is justified by neither science nor law. Only equal treatment of all children of Agent Orange will realize VA's mission: "To fulfill President Lincoln's promise to care for those who have served in our nation's military and for their families, caregivers, and survivors."

3

**PARTIES**

13.    Plaintiff Ronald M. Christoforo is a Connecticut resident and U.S. Army veteran who served his country from September 1969 to April 1972, including service in the Republic of Vietnam from June 1970 to May 1971.

14.    Plaintiff Michele Christoforo is a Connecticut resident and the child of Mr. Christoforo.

15.    Defendant U.S. Department of Veterans Affairs ("VA") is the federal agency that administers the laws providing benefits and other services to veterans, their dependents, and their beneficiaries.

**JURISDICTION AND VENUE**

16.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and the Due Process Clause and equality guarantees of the Fifth Amendment of the United States Constitution. An actual controversy exists between the parties under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to the Constitution.

17.    Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1)(C), as Michele and Mr. Christoforo are Connecticut residents, no real property is involved in the action, and the Defendant is a federal agency of the United States.

**FACTUAL ALLEGATIONS**

*The Christoforos*

18.    Mr. Christoforo grew up in North Haven, Connecticut, graduating from North Haven High School in 1965. He attended Milford Prep and Norwich University before transferring to Middlesex Community College, where he obtained his bachelor's degree in business administration and computer science in 1969.

4

19.    In September 1969, at age 22, Mr. Christoforo enlisted in the U.S. Army. While others sought to avoid service and the draft, including some of his friends who fled to Canada, Mr. Christoforo enlisted voluntarily, despite his high draft number making it less likely he would be conscripted. He believed he could use his computer-based skills to serve his country.

20.    Mr. Christoforo took a bus from New Haven to Trenton, New Jersey for basic training at Fort Dix, New Jersey. After basic training, the Army sent Mr. Christoforo to Fort Gordon, Georgia, where he trained to become a telecommunications technician ("tele-tech").

21.    At the end of training, the Army notified Mr. Christoforo he would deploy to Da Nang, Vietnam with the 5th Special Forces Group. He recalls feeling "scared as hell," but nevertheless deployed with his unit.

22.    As soon as he arrived in Vietnam in June 1970, Mr. Christoforo was exposed to herbicides including Agent Orange. As a tele-tech, his role was to fly to bases across the country with a Combined Action Platoon ("CAP") and install, operate, and maintain communications equipment. Each landing zone to which he traveled had been cleared with Agent Orange. The bases themselves were often surrounded by two to three hundred yards of defoliated land—so-called "kill zones" or "dead zones"—where U.S. forces had sprayed Agent Orange heavily to eliminate vegetation and improve visibility.

23.    While in Vietnam, Mr. Christoforo was attached to the U.S. Army Special Forces team ("Green Berets") assigned to his CAP. On multiple occasions, his unit came under active fire. He recalls bullets flying around him as the Green Berets ran toward the fighting. Many nights, he could hear nearby firefights and the sound of men wounded and dying. Throughout his deployment, Mr. Christoforo saw many body bags containing the bodies of fellow soldiers. The memory of these experiences still chokes him up more than fifty years later.

24. One of the most painful aspects of Mr. Christoforo's deployment was that the Army forbade him to keep letters from home. Each letter from a loved one was considered a potential security risk that could be used for blackmail. As a result, the Army required him to destroy them after reading each one. Mr. Christoforo remembers watching letters from home burn—small pieces of his life and his family reduced to ash.

25. Around the holidays at the end of 1970, the Army allowed Soldiers to return home for one week. Mr. Christoforo traveled back to North Haven, Connecticut, for Christmas. Despite the extraordinary dangers he had endured—including being caught in a convoy that came under fire and hearing nearby firefights on an almost-nightly basis—he returned to Vietnam after the holidays, committed to his unit and to his country.

26. The Army honorably discharged Mr. Christoforo in April 1972.

27. After his discharge, Mr. Christoforo returned to Connecticut and put his telecommunications skills to good use, working as a frame attendant for Southern New England Telecommunications ("SNET"), where he connected phone lines for new landline customers. He later became a programmer, retiring from SNET in 2009.

28. For the last twenty-three years and until present day, Mr. Christoforo has worked as a driver for West Marine, a marine and boat part supplier, based out of Branford and Old Saybrook Connecticut.

29. While working at SNET, Mr. Christoforo met his wife Mary-Lee Christoforo (née Rauch), who was a billing specialist at the time. Mary-Lee is not a veteran and has never been to Vietnam.

30. The two were married in May 1974. Mary-Lee has a son from a previous marriage who does not have a birth defect. While Mr. Christoforo loved taking care of his

stepson, including coaching his Little League team and Boy Scout troop, he dreamed of having a child of his own. At the time, he had no concerns that his service in Vietnam would affect his ability to have children or impact his child's health.

31.     On April 28, 1992, Michele Christoforo was born to Mr. Christoforo and Mary-Lee.

32.     Michele was born with achondroplasia, a genetic disorder commonly referred to as dwarfism. Individuals with achondroplasia face significant medical and functional challenges, including skeletal abnormalities, chronic pain, spinal complications, orthopedic limitations, and reduced life expectancy. On average, individuals with achondroplasia have a lifespan of approximately ten years shorter than the general population.

33.     Mr. Christoforo and Mary-Lee Christoforo have no family history of achondroplasia and are both of average stature.

34.     The only way for Michele to have received the mutation that causes achondroplasia is through Mr. Christoforo. Given Mary-Lee's stature, lack of family history, and first child's lack of achondroplasia, it is impossible for her to have the mutation.

35.     Michele's achondroplasia has had, and continues to have, a significant effect on her life. She experiences migraines, arthritis, and difficulty reaching objects necessary for daily living.

36.     Michele grew up in Branford, Connecticut. Throughout her K-12 education, Michele was accommodated but frequently reminded of her disability. Her school provided stools so she could reach her desk, but she would often stand up and often fall over because her legs had fallen asleep after a few hours of sitting on the uncomfortable stools.

37.     Nevertheless, her parents instilled in her a drive to succeed and taught her not to let others make fun of her. Michele graduated from Branford High School with high honors in 2011.

38.     Michele lives with her parents. To support Michele, the Christoforo family has made substantial, time-consuming, and costly modifications to their home and daily life. These include purchasing vehicle pedal extensions, smaller shopping carts, desks, chairs, bathrooms, sinks, and cabinets to ensure accessibility. These modifications often conflict with the needs of Mr. Christoforo and Mary-Lee, who cannot bend down as easily as they age.

39.     Michele faced accessibility challenges while continuing her postsecondary education. She started her undergraduate studies at Southern Connecticut State University, where the inaccessibility of the dorms required her to live further away and commute. She then transferred to Middlesex Community College, where she earned an associate degree in veterinary technology.

40.     Upon graduating, multiple veterinary offices rejected Michele's applications for employment. She believes these rejections were due, at least in part, to discrimination based on her disability.

41.     She was eventually hired by East Shores Veterinary Services, where only one of the offices was made accessible for her. In 2023, she moved to Durham Veterinary Hospital, where she is more accepted by her coworkers and has increasingly taken on more responsibility. Despite her success as a veterinary technician, Michele is often questioned by clients about whether she can perform her job due to her disability. Michele's job is much more physically and emotionally taxing because of her disability, leaving her consistently depleted after work.

42.     Michele will face increasing financial, physical, and emotional challenges from living with achondroplasia and require ongoing medical care, specialist appointments, and adaptive accommodation throughout her life.

43.     In January 2022, Mr. Christoforo applied for VA disability benefits for himself and for Michele, explaining that her dwarfism was caused by his exposure to Agent Orange in Vietnam. Shortly thereafter, in March 2022, VA rejected the request for benefits for Michele. The VA stated that for birth defects other than spina bifida, "the child's **Mother** must have had Vietnam of [sic] Korea service" (emphasis in original). VA also wrote that eligible children should submit a VA Form 21-0304, one different from the form Mr. Christoforo had submitted.

44.     On March 9, 2026, Michele applied for benefits under 38 U.S.C. § 1815 by submitting a VA Form 21-0304. On April 14, 2026, VA denied the application on the ground that "the **only** allowable benefit for children of male Vietnam Veterans... is spina bifida." VA did not dispute that she has achondroplasia, or that parental Agent Orange exposure may cause achondroplasia. Instead, the benefits "cannot be granted because the evidence shows [her] biological mother, Mary-Lee C. Christoforo, did not have qualifying Vietnam service."

45.     By VA statute and regulation, Michele has one year to file an administrative appeal, but any such appeal would be futile.

***Congress Has Gradually Recognized Agent Orange Exposure***

46.     Agent Orange was one of several tactical herbicides used extensively by the U.S. military during the Vietnam War. It contained dioxin, a highly toxic chemical contaminant linked to cancers, birth defects, and other disabilities.

47.     Beginning in 1979, in response to advocacy by Vietnam veterans, Congress imposed research mandates on VA to study the long-term effects of Agent Orange. But VA

neglected these mandates. And despite growing evidence elsewhere of the long-term effects of Agent Orange, VA was halting in its response.

48. Mounting congressional dissatisfaction with VA's pace, encouraged by the advocacy of Vietnam veterans, led the VA Administrator in 1982 to transfer primary responsibility for the Agent Orange epidemiology study to the Centers for Disease Control ("CDC").

49. Persistent efforts by Vietnam veterans led Congress to grant VA authority to recognize conditions as service-connected based on Agent Orange exposure in the Veterans' Dioxin and Radiation Exposure Compensation Standards Act of 1984. Initially, however, VA concluded that only one condition—chloracne—was presumptively service-connected.

50. CDC released its limited conclusions in 1990, which assessed only the link between herbicide exposure and select cancers. This analysis was narrower than Congress's mandate to assess all long-term adverse health effects of exposure to dioxins produced in the manufacture of various herbicides, including Agent Orange.

51. The next year, Congress passed the Agent Orange Act of 1991, which established a pathway for expanding conditions recognized as service-connected, directing the Institute of Medicine (IOM, now National Academy of Sciences ("NAS")) to issue biennial reports evaluating the state of scientific evidence on all conditions potentially associated with dioxin exposure, forming the basis for VA's provision of additional benefits.

52. Today, by statute and pursuant to VA regulations, veterans who served in Vietnam between January 9, 1962, and May 7, 1975, are presumed to have been exposed to herbicides, including Agent Orange.

53.      In the wake of the IOM reports and following litigation by Vietnam veterans, VA has increasingly recognized many herbicide-related disabilities of veterans who served in Vietnam as presumptively connected to their service, rendering Vietnam veterans with those disabilities eligible for disability compensation benefits.

### Children of Agent Orange

54.      A different statutory and regulatory scheme governs VA benefits for children born with birth defects and for whom one or both parents served in Vietnam.

55.      Early government studies assessing potential association between paternal dioxin exposure and birth defects relied on limited data sets, excluded subsets of post-exposure conceptions, and applied restrictive exposure thresholds.

56.      For years, the best available research on paternal exposure to dioxin was the "Ranch Hand Study," which began in 1982 and examined Air Force personnel involved in aerial herbicide spraying operations, dubbed Operation Ranch Hand, in Vietnam.

57.      This study, first publicly released in 1990 and updated several times until 2006, identified associations between elevated dioxin levels and adverse reproductive outcomes, including birth defects. The study found that children of veterans exposed to dioxin had a higher overall proportion of birth defects compared to the control group.[1]

58.      For women Vietnam veterans, Congress affirmatively mandated in the 1985 budget an epidemiologic study of the long-term health effects of Agent Orange on women who served in Vietnam. While the mandate did not explicitly reference reproductive health outcomes, it directed VA attention to "gender-specific health effects."

---

[1] William H. Wolfe et al., *Paternal Serum Dioxin and Reproductive Outcomes Among Veterans of Operation Ranch Hand*, 6 EPIDEMIOLOGY 17 (1995).

11

59.     Both the Ranch Hand Study and the study on women Vietnam veterans contributed to the IOM's 1996 finding of limited, suggestive evidence associating herbicide exposure to spina bifida in children.

60.     Veterans organizations continued to urge Congress and VA to address the needs of the children of Agent Orange. In the Agent Orange Benefits Act of 1996, Congress authorized benefits for these children, recognizing for the first time that VA could address the health outcomes of veterans' children, not just veterans themselves. This provision, codified at 38 U.S.C. §§ 1801–1805, provides benefits to children of both male and female Vietnam veterans who are born with spina bifida. The statute does not address any other birth defects.

61.     The 1998 iteration of the women Vietnam veterans study, published in 2000, a significantly elevated risk of moderate to severe birth defects in children of women Vietnam veterans, compared to children of women veterans who served during the Vietnam era but not in Vietnam.[2]

62.     In response, Congress authorized benefits to "children of **women** Vietnam veterans" with birth defects that VA finds are "associated with [their] service in the Republic of Vietnam" and result in "permanent physical or mental disability." Veterans Benefits and Health Care Improvement Act of 2000 (codified at 38 U.S.C. §§ 1811–1816) (emphasis added).

63.     Veterans organizations recognized at the time that while scientific evidence did indeed support provision of benefits to children of female Vietnam veterans, the bill's exclusion of the children of male Vietnam veterans was not grounded in adequate research.

64.     In testifying before the House Committee on Veterans Affairs in 2000, Vietnam Veterans of America noted that research was incomplete absent a congressional mandate to

---

[2] Han K. Kang et al., *Pregnancy Outcomes Among U.S. Women Vietnam Veterans*, 38 AM. J. IND. MED. 447 (2000).

perform the same epidemiological study of long-term health impacts on male Vietnam veterans that had been done for women Vietnam veterans, including reproductive outcomes.

65.     Testimony from Dr. Linda Schwartz, a leader of Vietnam Veterans of American and then Chair of the VA Advisory Committee on Women Veterans, similarly stated that the Ranch Hand Study was an inaccurate reflection of the health and reproductive outcomes of the majority of men who served in Vietnam.

66.     Congress also recognized at the time that the bill's provision of benefits to children of women Vietnam veterans would not provide for a significant number of new beneficiaries. A Congressional Budget Office Analysis of the bill indicated that fewer than 200 children would be eligible for benefits under the bill.

67.     Following the passage of the 2000 bill, VA relied on the 1998 study to identify, all at once, eighteen types of birth defects, referred to as "covered" birth defects that, based on a combination of genetic and environmental factors, were associated with service in Vietnam.

68.     VA recognizes achondroplasia as one of its eighteen "covered" birth defects under 38 C.F.R. § 3.815(d)(1)(i). Pursuant to the statute and implementing regulations adopted in July 2002, a child born with achondroplasia is thus eligible for benefits if her mother served in Vietnam, but she is categorically ineligible if only her father served in Vietnam.

69.     Accordingly, although Michele Christoforo suffers from a VA-recognized covered birth defect, she is ineligible for Chapter 18 benefits. Her legal exclusion is based solely on the sex of her veteran parent, not on science.

70.     Despite Mr. Christoforo's presumptive and actual exposure to Agent Orange and Michele's achondroplasia, VA has denied that there is sufficient evidence of a causal link between paternal dioxin exposure and covered birth defects.

71.    Fewer than 200 children with birth defects born to women who served in Vietnam are eligible for VA benefits. Approximately 350,000 children with birth defects born to men who served in Vietnam are ineligible for those same VA benefits. Using CDC and VA data, this estimate reflects the documented birth defect rate of 64.6 per 1,000 births among Vietnam veterans' offspring, applied to an estimated pool of approximately 3.6 million children fathered by male veterans after the war.

### Modern Science Shows that Agent Orange Exposure Causes Birth Defects in Male Veterans' Children

72.    When 38 U.S.C. § 1812(a) was passed in 2000, in the early days of modern genetic research, there was little proof that male Agent Orange exposure caused birth defects in their children. That is no longer true. Contemporary science has proven that fathers who were exposed to Agent Orange are more likely to have children with birth defects than fathers who were not exposed.

73.    For decades, the Ranch Hand Study has been incorrectly cited as evidence that Agent Orange exposure does not cause birth defects in male veterans' children. In reality, the original Ranch Hand study was inconclusive regarding defects.[3]

74.    The data underlying the Ranch Hand Study is no longer inconclusive. Modern analyses using the same data set have confirmed that exposure to Agent Orange leads to birth defects in male veterans' children.[4]

---

[3] W.H. Wolfe, J.E. Michalek, J.C. Miner, A.J. Rahe, *The Air Force health study: An epidemiologic investigation of health effects in Air Force personnel following exposure to herbicides, reproductive outcomes*, 25 CHEMOSPHERE 217 (1992).

[4] George Knafl, *A Reassessment of Birth Defects for Children of Participants of the Air Force Health Study*, 8 OPEN J. OF EPIDEMIOLOGY 187 (2018).

75.    The same veterans who had fathered healthy children before the war saw a significant increase in birth defects in the children they conceived after their exposure to Agent Orange.[5]

76.    Data maintained by VA itself supports this conclusion. A review of 37,535 veterans in VA's own Agent Orange Registry found that veterans exposed to Agent Orange are significantly more likely to father children with birth defects when compared to non-exposed veterans.[6]

77.    A review of the Ranch Hand Study also found that the most common birth defects linked to Agent Orange are bone and muscle issues (musculoskeletal) and developmental disabilities, including achondroplasia.[7]

78.    Michele has achondroplasia because of a genetic mutation she inherited from her father, Mr. Christoforo. This genetic mutation is a direct result of Mr. Christoforo's exposure to Agent Orange in Vietnam.

79.    Since 2000, scientific evidence has shown that when Agent Orange causes birth defects, fathers are usually the source.

80.    These defects often stem from "germline mutations," or changes in the reproductive cells (i.e., sperm or egg) that affect every piece of a child's DNA. Research shows that the toxic dioxin found in Agent Orange primarily damages the father's sperm.[8]

---

[5] George J. Knafl, *An analysis of birth defects and developmental disabilities for children of participants of the Air Force Health Study*, 117 REPRODUCTIVE TOXICOLOGY 108355 (2023).

[6] Fresques, Ornstein, and Pierce, *Agent Orange Exposure and Birth Defects: Exploratory Data Analysis,* PRO PUBLICA (2016).

[7] George J. Knafl, *An analysis of birth defects and developmental disabilities for children of participants of the Air Force Health Study*, 117 REPRODUCTIVE TOXICOLOGY 108355 (2023).

[8] Matti Viluksela & Raimo Pohjanvirta, *Multigenerational and Transgenerational Effects of Dioxins*, 20 INTERNATIONAL J. OF MOLECULAR SCIENCE 2947 (2019).

81.    Agent Orange has been shown to affect reproduction in two ways: sperm mutagenesis (genetic changes from fathers) and teratogenesis (fetal damage from mothers).

82.    Achondroplasia is caused by mutagenesis,[9] and is therefore tightly linked to paternal Agent Orange exposure.[10]

83.    The research and evidence to date confirm that Mr. Christoforo's exposure to toxic herbicides during service is the cause of Michele's disability. Michele has no family history of achondroplasia, a mother of average height who has a child without birth defects from a different father, and a veteran father exposed to Agent Orange in Vietnam. Nor is the genetic mutation that causes achondroplasia the result of pregnancy, gestation, or childbirth.

84.    In light of this robust and growing body of evidence, presumptively excluding the children of Vietnam veteran fathers from benefits related to their birth defects is irrational and constitutes both illegal and unjustifiable discrimination on the basis of sex.

---

[9] Suzanne M de la Monte & Anuva Goel, *Agent Orange Reviewed: Potential Role in Peripheral Neuropathy and Neurodegeneration*, 30 J. OF MILITARY VETERANS HEALTH 17 (2022).
[10] Angela E. Scheuerle & Arthur S. Aylsworth, *Birth defects and neonatal morbidity caused by teratogen exposure after the embryonic period,* 106 BIRTH DEFECTS RES A CLIN MOL TERATOL 935 (2016).

## LEGAL CLAIM OF MICHELE AND MR. CHRISTOFORO

### CLAIM I

### Violation of the Fifth Amendment of the United States Constitution
### Equal Protection – Sex Discrimination

85.     The allegations of the preceding paragraphs are incorporated by reference as if they were fully set forth herein.

86.     Section § 1811(1) of Title 38 of the U.S. Code defines an "eligible child" as an individual who is the child "of a *woman* Vietnam veteran" (emphasis added) and was born with "one or more covered birth defects."

87.     The statute authorizes the Secretary of VA to provide health care, vocational training, and/or monetary allowances for eligible children. *Id.* §§ 1813–1815.

88.     Children of male Vietnam veterans are never eligible under any circumstances based on the definition in § 1811(1).

89.     38 U.S.C. § 1811–1815 discriminates on the basis of sex because it mandates differential treatment of similarly-situated children solely based on the sex of their parents.

90.     Michele Christoforo was born with achondroplasia, which is a "covered birth defect," 38 C.F.R. § 3.815(d)(1)(i), for children of mothers who served in Vietnam.

91.     Michele can never be eligible for benefits under 38 U.S.C. § 1813–1816 because her veteran parent, Mr. Christoforo, is male.

92.     All other circumstances equal, if Mr. Christoforo were female, Michele would be eligible for benefits. The only difference in eligibility is the sex of her parent.

93.     All other circumstances equal, if Mr. Christoforo were female, he could rely on the benefits provided under 38 U.S.C. § 1813–1815 to ensure his child would receive the medical

17

care, educational benefits, and income support she needs. The only difference in his ability to have this assurance is his sex.

94.    Discrimination based on sex is constitutionally suspect. Sex-based classifications are subject to intermediate or heightened scrutiny under the Fifth Amendment. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190 (1976); *United States v. Virginia*, 518 U.S. 515 (1996).

95.    This intensive inquiry applies equally when discrimination based on the sex of the parent affects a child's access to benefits. *See, e.g., Sessions v. Morales-Santana*, 582 U.S. 47 (2017) (holding sex-based discrimination in immigration statute unconstitutional where it required children of unwed citizen fathers to prove more years of physical presence in the U.S. than it required children of unwed citizen mothers to prove in order to acquire citizenship).

96.    Intermediate scrutiny requires that the government prove that the discriminatory law (1) serves an important governmental interest; and (2) be substantially related to such interest.

97.    Furthermore, the justification offered must be "exceedingly persuasive," genuine, and not a rationalization constructed after the fact. *United States v. Virginia*, 518 U.S. 515, 533 (1996).

98.    The sex discrimination in §§ 1811–1815 does not serve an important governmental interest and is not substantially related to any such interest.

99.    To the extent the government argues the classification serves a remedial purpose, *Weinberger v. Wiesenfeld* forecloses using a remedial rationale to deny benefits to innocent third parties, here, a child with a disability, who played no role in any historical discrimination against female veterans. 420 U.S. 636 (1975).

18

100.    Scientific studies of the link between parental Agent Orange exposure and the development of achondroplasia in offspring show clearly that there is no scientific basis for excluding children of male veterans from receiving benefits that children of female veterans receive.

101.    Conservation of government resources does not render sex-based discrimination constitutional. *See, e.g.*, *Pedersen v. Office of Personnel Management*, 881 F. Supp. 2d 294, 343 (D. Conn. 2012) ("[M]ore than an invocation of the public fisc is necessary to demonstrate the rationality of selecting [one group], rather than some other group, to suffer the burden of cost-cutting legislation.").

102.    Sex-based distinctions in benefit schemes that condition a family member's eligibility on the sex of the service member or wage earner are unconstitutional. *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975); *Califano v. Goldfarb*, 430 U.S. 199 (1977).

103.    Civilian and military benefit schemes that discriminate on the basis of sex are unconstitutional. *See, e.g.*, *Frontiero v. Richardson*, 411 U.S. 677 (1973); *Califano v. Westcott*, 443 U.S. 76 (1979).

104.    38 U.S.C. § 1811–1815 impermissibly discriminates on the basis of sex in violation of the Fifth Amendment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

(1)    Declare that the sex-based distinction in 38 U.S.C. §§ 1811, 1812 violates the equal protection component of the Fifth Amendment Due Process Clause.

(2)    Declare that 38 C.F.R. § 3.815 is invalid and unenforceable to the extent it excludes biological children of male Vietnam veterans from receiving benefits for covered birth defects, including achondroplasia.

(3)    Issue a Permanent Injunction enjoining Defendants from enforcing the gender-based restrictions of 38 U.S.C. § 1811 and § 1812 so as to deny benefits to the biological children of male Vietnam veterans who otherwise meet the criteria for "covered birth defects" and requiring Defendants to adjudicate Plaintiff Michele Christoforo's claim for benefits under the same standards applied for children of female Vietnam veterans;

(4)    Award Plaintiffs reasonable attorney's fees, expenses, and costs of this action pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

(5)    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

By: /s/ Michael J. Wishnie
Charlotte Densmore, Law Student Intern*
Natalie Kelly, Law Student Intern*
Kegan Strawn, Law Student Intern*
Ashley Anderson (ct32022)
Michael J. Wishnie (ct27221)
Jerome N. Frank Legal Services Organization
Veterans Legal Services Clinic
P.O. Box 209090
New Haven, CT 06520-9090
(203) 432-4800
michael.wishnie@ylsclinics.org

*Motions for Law Student Appearances
forthcoming

20